I'm fine, Your Honor, and it's good to see you again. This appeal focuses on another aspect of the extraordinary proceedings below that underscores the need for a new trial. The difference between the volunteer status of both Dr. Morris, who testified as plaintiffs' experts and defendants' paid experts, was a recurring theme in the proceedings below. A suggestion by one of the defendants' experts that all experts on both sides were compensated drew an immediate reaction from the plaintiffs. In arguing why Dr. Matthew Morris could provide expert testimony without complying with Rule 26, plaintiffs told the judge, and here I'm quoting, It is very important for the Court to know and for the record to reflect that Dr. Matthew Morris was properly and timely disclosed as non-retained. We have no economic arrangement with him. We do not fund him. And plaintiffs returned to this theme again in closing argument, contrasting the Morris with the bought testimony of defendants' experts. We now know that this was not true. We now know that Dr. Bernard Morris, Dr. Morris Sr., was promised a $10,000 contribution to his charity of choice before he ever testified. We now know that Dr. Matthew Morris expected to be compensated all along and asked plaintiffs' counsel where to send his invoice after he testified at trial. We now know that Dr. Matthew Morris was paid $30,000 for his testimony, and we now know that Dr. Bernard Morris was paid $35,000 on top of the $10,000 contribution in what my friends on the other side described in their own brief as, quote, thank you payments. And how did this information come to light again? This came to light in the discovery in the third case, and particularly in the depositions and the letters. The letters essentially from Mr. Lanier to both Dr. Morris came to light in that process, and then we brought them timely to the district court's attention. But by that point, the principal appeal had already been filed. That's why it was styled as a new trial motion under 60B. The difficulty here is, I mean, those are the pieces you offered and you did offer below to meet your clear and convincing evidence standard. So are we reviewing the district court's conclusion that they didn't know that they were going to be paid only for clear error? I think it is probably a clear error standard, but we think this is the rare case. It's a high hurdle in district court, and then it's a double high hurdle to us because he heard what you're saying and said, you know, I was the judge in the best position to tell. And I think the Morris, they got a lot of money in the end, which they were happy to get. But it's like, again, in a criminal case, cooperative codefendant says, I'm going to plead straight up. I got no promises, but I sure would be happy later if I got less time. Well, two things, Your Honor. There's no misrepresentation. Two things, Your Honor. I don't think that analysis works as to the charitable contribution. And there's nothing — I mean, you're applying a clear error standard, I suppose, but there's no analysis. The district court judge doesn't mention the charitable contribution. I mean, if he did, he could say, I think a charitable contribution to a third party as a matter of law isn't a payment that's relevant for purposes of Rule 26. That would be wrong if the person chose the third party, correct? Which we think it's clear from this record that that's exactly what happened. But my point is, I don't think because the district court said, essentially, with a wave of the hand, I don't think there's anything here, and doesn't specifically address or even offer a theory as to how, in particular, the $10,000 charitable contribution means that the statements were accurate. I mean, I think if you — my humble point is, I don't see how a court could address the accuracy of that payment without articulating a theory as to how that doesn't count, and that would either be flat wrong as a matter of fact or flat wrong as a matter of law. Now, to your second point, whatever is the context in the criminal context and Your Honor's more familiar with that than I am, but I sure hope the rule in the civil context is not that this can happen. And I mean, at some level, that's the question for this Court. And I suppose, you know, I'm a hopeful person, so I'm hopeful that you're going to grant a new trial on an independent ground as well, but I think this is a basis for granting a new trial here. But whatever else emerges from this appeal — Sotomayor, is that expert payment always a ground for a new trial? Do you have 60b3 cases that say that? No. No. I don't think it always is. I think it depends on — I mean, you know, obviously, if you had an — what I would sort of describe as more of a technical Rule 26 error, you know, and then I think you might have a situation where it doesn't meet the 60b3 standard. I think the cases that we cite you, which are district court cases, and they're not appellate courts reviewing them under a deferential standard, but the district court decisions, I would say in the context of those trials, yes, it was sufficiently prejudicial for 60b3 purposes, because what those cases have in common with this case is the difference between the plaintiff's witnesses and the defendant's witnesses was averted to, more than averted to here. And, you know, in the Synergy case, for example, the Court makes something of the fact that it came up in closing argument, which, of course, it came up in closing argument here. But what I would say is that I think with respect to Dr. Bernard Morey Sr. and the $10,000 charitable contribution, I don't think you have to even get into the issue of can it really be the law that you can say they weren't paid a dime and then pay them later. For Dr. Matthew Morey and for purposes of the $35,000 payment to Dr. Bernard Morey, you have to address that issue. And whether it's the basis for granting a new trial motion or whether there's a new trial motion granted on another ground and the Court just clarifies it, boy, I hope the Court clarifies that this can't happen, because this does seem like something that the system shouldn't tolerate. Rule 26, and if Rule 26 had been complied with here, there would need to be a disclosure of payment. Rule 26 language talks about the amount the expert is, quote, to be paid. So I don't that... Let's say you didn't ask for the expert report until the night before, and then the Court actually said you can depose him, but you never then asked him about who's paying you? So here's what happened with respect to Dr. Bernard Morey, for example. He was... We did not depose him originally, in part because we didn't actually think that he was going to testify. When he did testify and it was made clear what he was going to testify and that he was going to testify as an expert, of course, first we're told, we don't have to comply with Rule 26 because he's a non-retained expert. And we objected to that, and the Court, relying on the representation that he had, then we objected to what he was going to testify on, on the eve of his testimony, and we were given two things. We were given by the district court the opportunity to depose him, which, for reasons I'm happy to get into the details of, but in the middle of trial, we didn't think it made sense to depose him and distract our attention from the trial. And we also thought there were tactical reasons not to do it because the district court had made clear that not only would we get a chance to depose him, but that Mr. Lanier would get a chance to do a direct videotaped deposition of him that he could then use in subsequent proceedings. And so we had our reasons for not wanting him to be deposed at that particular time. But then the district court ordered that an expert report be given since he already had said that Rule 26 doesn't apply because he's a non-retained expert. It was not an expert report that I think, you know, it doesn't look anything like an expert report compliant with Rule 26 should have, and as part and parcel of that, it doesn't say anything about the compensation. So if this had been done right and truthfully from the beginning, we would have gotten compliance with Rule 26. And my point about Rule 26 is that Rule 26 by its own language I think forecloses this testify as a volunteer early, pay me later, and we can all make this look a lot better for the plaintiffs than the defendants. Rule 26 I think forecloses that by asking about the amount to be paid. The jury instructions here about prejudice, and I want to get them, you know, exactly right, the jury was expressly told that they could, quote, consider any biased evidence that the expert witness has been or will be paid for reviewing the case and testifying. So I think the law appropriately is not concerned about when the checks are cut. They're concerned about truthfully disclosing whether or not you have a paid expert or a volunteer expert, and when one side makes repeated references to the fact that their experts are volunteers and are therefore more credible than these paid mercenaries from the other side, they can't convert their own volunteer witnesses to paid witnesses after the fact through thank you payments. Go ahead and finish. No. Go ahead. I was simply going to say, and I really hope that's the law. Do you see this as a form of cumulative error? Let's say it doesn't win standing alone, this 60 v. 3. But do you see that as something that would blend in with other claimed errors such as these evidentiary errors, et cetera, that would be a type of cumulative error? Let me try to answer that this way, Judge Barksdale. I think when the court is evaluating 60 v. 3 and whether or not this error deprived our clients of a full and fair opportunity to put on their defense, I don't think the court has to look at this in a silo. I think it can avert itself to those other considerations and the way the rest of the trial proceeded. I'm pretty firmly of the view that you don't have to do that here because I do think that in the context of this case, when there were, I mean, you know, this isn't a case where you have to take my word for it that the difference between paid status and volunteer status is important because counsel for the other side told the court this is very important and I want the record to reflect it. This is not a case where you have to wonder whether this is something that was a recurring theme because it absolutely was, and you have this, you know, in my view, relatively dramatic incident where one of our experts says, yeah, I'm paid like everybody else, and oh, no, objection, objection. You know, Dr. Morey wasn't paid. Dr. Matthew Morey wasn't compensated. And then if you look at, if you read on for a couple pages in that sort of testimony of our expert, I mean, our expert apologizes three or four times for making a mistake. I mean, you know, the idea that this didn't have a material impact, particularly when it's picked up in the closing argument, even considered alone, I think is just wrong. But I do think in looking at the outcome, the test is your presentation of trial strategy, correct? Exactly. Exactly. Is it fair, then, to look at the next trial when you knew they were being paid and ask did your presentation change? Well, I don't know that, I mean, I don't think you'd want to build that into your test because in most other cases, you're not going to have a next trial. And even then, I think you sort of have problems because even in the next trial, we still don't have, even though we have better disclosures, we don't have a fully compliant Rule 26 expert report. I mean, you know, I'm going outside the record here, but my understanding is that the — Your wishfulness that there could be no thank you payments, of course everyone feels that's important, but there would have to be a nexus to the witness making a misrepresentation at the time. In other words, wouldn't the law require that he knew he was going to get the gratuity? I don't think so. I don't think so. Isn't the case law to help with this? Because it would seem to be recurring a lot, you know, experts all the time, if you don't have to disclose their money by just saying we'll pay you later. I think if this were permissible, it would happen all the time. I think the system is operated on the assumption that of course you can't do this. I think that 60B-3, I think, refers to fraud, misrepresentation, or misconduct. I think subsequent payments, even if they — I mean, you know, I think I can argue that the subsequent payments make the representation a misrepresentation, and there's a little bit of a time warp there because maybe it was not a misrepresentation when it was made, but if you don't follow my time warp argument on the misrepresentation, gosh, it's got to be misconduct. Is conduct focused on the attorney or the witness? I think it can be either. And I think here — It's true. I think here — look, I think it can be either. I think if you look at the cases that we cite, like the Synergy case and the — I think it's the Vioxx case. I mean, in those cases, it's sort of a combination. The courts are mixing essentially what the witness did and what the counsel represented about their payment status. The coterminous letters that specifically say, this is not to pay you back, how do you handle those? Right? Well, no, no, no. The letters that were saying, we sure now in hindsight think you did a good job, so $30,000, $35,000, but we are not paying you because that was the arrangement. Right. I agree the letters say that, Your Honor. I can't imagine that makes any difference whatsoever. I mean, because otherwise — I mean, if you want these letters to become form letters that are going to be used by plaintiffs and defense lawyers going forward because these letters are artfully worded and allow you to evade Rule 26 and — The deposition for the younger, the son, he says — he asked, where do I send my invoice? And they don't say, hey, you were never paid, you're not getting a penny. They say what? They say essentially don't worry about it. I mean, that's the gist of it. Don't worry about it. But he says, he does testify to be clear that he had a present expectation that he would be compensated. And my friends on the other side do a nice job of trying to inject confusion as to which side would compensate him. I mean, first of all, whatever is true of the deposition before it's clear that he's going to be their only expert to take issue with our warnings? I mean, after he's testified, the idea that we would pay Dr. Matthew Mori for that testimony is, with all due respect, absurd. But in all events, we know from his testimony he knew who to ask where to send the invoice, and it wasn't the counsel for the defendants. So I see my time has expired.  You've saved time for rebuttal, Mr. — Thank you, Your Honor. Mr. Lanier. Thank you, Your Honor. May it please the Court. There's no truth to the way the painting has been portrayed to the Court. There's just not. And I'm here to tell you exactly how it went down if I could, and I'll try and do it without the need for popcorn and do it as best as I can in an appellate voice. But I do feel engaged in this, so with apologies beforehand, here I go. Bernard Mori was the father of Matt Mori. He agreed to meet with us. Now, wait. Is all this on the record? Yes, Your Honor, it is. And, in fact, you not only have the record of the trial, but you have the subsequent trial part of that record as well, because as Judge Smith asked, how did you know about this, the answer is we gave all of this to them and we told them this, and we recited this in the next trial in testimony when I had the witness on the stand. So you do agree you met with Dr. Mori Sr. before the Aoki trial, and the issue of donating $10,000 to the charity he chose was discussed? No, sir. I agree that I met with him, and I asked him, how do we pay you for your time? He said, I don't take payment. I won't take payment. I said, is there a charity that I could give to? And he said, well, if you want to, St. Rita's School, he said, is a charitable endeavor. There was no discussion of an amount. And you paid $10,000 to that? No discussion of an amount at all. No, but how does that not pay then? When he says I'm unpaid, but you've had a discussion before trial, and he chooses the charity, and you send him a $10,000 check. The check was – it just didn't unfold that way, Your Honor. But you just said that's exactly how it unfolded. You've left out some steps. I said, is there a charitable endeavor that we could give to? He said, if you want to. There was never any more comment that was made. But then you did. I did not until after the trial, Your Honor, because – But then you have him on the stand, and he says over and over again, I'm doing this because this stuff is terrible. I'm here for free. Right. You're impeaching their witnesses, saying they are bought testimony, they're bribed, and you know that you discussed with him? You asked him for a charity, and then you sent a $10,000 check. No, Your Honor. That is not the way it unfolded at all. What happened is, is I asked him, would you come testify, and he said no. He met with the other side, and the other side had a meeting with him without us there. And he told them he wouldn't testify either. So any comment I made about giving money to a charitable endeavor that he's got an interest in was one – You think he assumed you wouldn't, so when he gets on the stand and says, I'm not being paid, he doesn't think you're going to then do it later? And in your mind, you haven't decided if you're yet going to pay $10,000? I think it had left both of our minds, to be honest with you. I asked him when he came to the stand, would he come testify for three hours. And he came for three hours, but it stretched into a day. And then beyond that, the other side said they wanted to take his deposition, and so the judge made him kill another day for his deposition. They backed out the night before. The judge – the other side wanted a report, so he issued a report, which we cobbled together from his testimony. And then $30,000 extra? What's wrong with calling it a thank you payment? Why isn't that just what it is? Why, given that uncertainty, would you ever send a witness $30,000 after the trial? What we did is we realized that we may need him to come testify again in another case. But it reflects payment for the past. Yes, Your Honor. What it does is he said he wouldn't take any money, and he meant it. And we sent it to him in hopes he would so that maybe next time he'd testify again. And that's what we clarified with everybody on the record. We self-reported this. They didn't find this out in any other way other than me saying, hey, look, you're testifying again, and we need to make sure this jury and court understands. And that's when I laid it all out exactly how it unfolded. They had the expert that I was concerned about on their side, their anti-Morrie, was Dr. Cato Lorenzen, who they paid over $900,000 to. He charged $15,000 a day. And what I did is I thought, well, what we did, it was a corporate decision. We want to try and get Dr. Morrie to testify again. This turned into a three-day fiasco, not a three-hour fiasco. Totally messed up his schedule. He's not going to be friendly to us at all. What can we do? Well, let's reimburse him for his time. We can't reimburse him on the level of Cato Lorenzen, even though he's much more qualified. But if Cato charges $15,000 a day, we'll do his based on $10,000 a day. They had another expert that was in that same ballpark. And so we paid him. Money for experts, any money at all, a penny for an expert, is a very dangerous area to be in. So an agreement before trial, $10,000, but it goes to a third party, and then later, a $30,000 check? That's a complicated situation. No agreement beforehand, Your Honor. I thought you said you met with him and you discussed and you asked him, what's the charity you like? Your Honor, I asked him, would you take payment, and he said no. All right, we've been over that. And what I said in his specific comment on the charity was I don't care if you give it or not. It doesn't matter to me. There's no agreement, no meeting of the minds that we're going to pay, no discussion of an amount. None of that happened at all. Lawyers do make mistakes accounting for payments, all sides, everybody. So what's your best? I really like case law. What's your best case that an undisclosed payment to an expert is not a 60B3 reversible error? I can't find any case law one way or the other, Your Honor. But there were a whole bunch of district court opinions cited. What's the one you think most stands for the fact that an attorney can talk before about money, later send trial, but that's not a disclosable payment? I don't have a case, Your Honor, that can say that. But what I can tell you is every word that I uttered was true. Well, you say that. I read the district court's order, and it seemed to me he pretty much jumps very quickly to the, you know, this didn't change, this didn't prejudice. Right. That these were small amounts, they got big amounts, and, therefore, it's really not that egregious. I don't think I would agree that he immediately jumps to. That's at the very end of his opinion. But beforehand — Does he cite any cases? No, Your Honor, he doesn't. He does cite Rozier and some other cases in the process of the opinion for what his standard of proof is and what he has to do. But that's a different issue. And so the bottom line is, is everything that we did, everything we said to the jury, everything that that doctor testified to was absolutely dead-on truthful. He would not take any money from us. Well, confirm for us and for the recording of this argument. Thank you. Was the $10,000, quote, charitable contribution, close quote, made before the Christopher trial? No, Your Honor. To the best of my memory and to the best of our understanding, it was made afterwards. And that's certainly what the testimony is on the record from the doctor's understanding. I don't think — I'm not sure when, how, where any of us knew that because of the process of doing something like that. But it would help me to have been made beforehand when there was no consideration that he'd come testify. But I can't affirmatively say that it was. I just don't know. But I can tell the Court this, that the discussion was not one where I ever told him an amount. There was no we would definitely do it. I'm walking out the door of his house, and I said, man, I just feel bad. Your wife made an apple pie for us. All of this. How long did you meet? What was the period of time between when you met with him and when he testified at trial? I met with him in August. The defendants met with him in December. He testified in the trial that started in January, and I think he took the stand near the end of January, or maybe it was into February. But I met with him in August. And ask for an explanation for the son saying, I did expect to get paid. That was news to me. I never dealt with the son, Your Honor, to be candid with you. Right. I met him the night before he took the stand. He says, I expected to get paid, and after the trial he gets $35,000. But the argument is here he was unretained. Son got $30,000. Father got $35,000, just for the record's sake. No, Your Honor, what it looks to me like, and my best understanding is, is the defendants, and this was news to me, paid him $10,000 before his deposition. And I didn't know that when I said he hadn't been paid. I didn't know they'd paid him $10,000 for that day of his deposition. But the defendants had paid him. It's in the record that they had paid him, and if I had attended the deposition, I'd have known it. But I didn't read the deposition and see that they had paid him $10,000. So in his mind, he'd never testified before. These guys aren't the professional witnesses. Neither one of them testified. And so what he said is, hey, and I guess I don't know who he was talking to, but where do I send my invoice? And he's thinking that he sends it to DePue because we won the case, and they must pay because they paid for his deposition. I would think if you have the very rare expert that is completely voluntary because it's angelic and it's not bribed, when he says where do I send my invoice, you've got to look him in the eye and say there is no payment. You took the stand and said you won't. That was crucial to our presentation to the jury. You don't say don't worry about it. And then pay him. Frankly, I think in regards to him, I think his thought was his clinic has to be paid, and so he's suggesting, and if you look carefully, he doesn't ask that until after the trial. So, again, this in my brain is not anything. There's no – look, I had a ton of experts that I paid a ton of money to. I have zero qualms telling the jury what we've done. With every one of my experts, how much did we pay you, Dr. Athanasiou? $95,000. How much have we paid you, Dr. Burstein? $130,000. That's just part and parcel of it. That's why in the next trial when I put Dr. Morey on the stand, I said, now, how much have we paid you? Well, and we walked through all of this, and that's how it came to light. And in each of those trials, and how much are we going to pay you now? Well, again, I don't come here for the money. You pay me whatever you decide to pay me. The test is would it have altered the presentation of the trial. And I don't see – But you bolstered them over and over again. These are volunteers. And then you discredited your opponents. These people, their testimony is bought. It's even bribed all over the world. The contrast just is extraordinary. It's a brilliant strategy, but it doesn't bear out if you're paying them afterwards. No, Your Honor, with due respect. The world stuff and the bribery all over the world and their patriotic wall and all of that stuff aside, what I did in the case is the truth. I mean, if I had stood up and said, there's zero problem saying, hey, we made a $10,000 donation to a charity because you wanted us to. He didn't want us to. He didn't ask us to. If I had said that, it would have been a lie and it would have been wrong. If I had said, hey, it turns out instead of being here three hours because of the way this has gone down, you're going to take three days out of your life. And it's a whole different scenario than what you agreed to because the judge wouldn't dismiss you and let you go after three hours. And so as a result of everything you did, I'm going to probably pay the doctor. If I had said any of that to the jury, I'd have been arguing outside the record. And so we're sitting here in a situation where, frankly, we never thought we'd have we'd even see the doctors again until it became apparent that we were going to have multiple trials. And then it became apparent of, gee, man, we feel kind of bad. We said, can you give us three hours? And it turns into three days. So let's send it and hope that they'll take it and say that it's payment. Let's describe it very carefully in the letter so that it's documented for the file so that we can give it to the other side, so we can give it to his honor so that anybody will know. Transparency is the key. And let's be real clear. And we did that and we sent a copy to the other side. This is all for the third Anderson trial. Yes, Your Honor. Everyone's saying you did it perfectly there, but the depositions had exposed that there were payments. So it's pretty obvious you're going to at that point have to do that. No, Your Honor. We wrote those letters before the depositions. We wrote those letters very clearly when we sent the checks to them. Those letters accompanied the checks. We wanted transparency. We wanted it real clear. And then we affirmatively sent those to the other side before the depositions as well. And the other side then took the deposition of Maury Sr. up in Rochester, Minnesota. The purpose of transparency is that the jury deciding the case hears it. The jury didn't get those letters that, hey, we are going to pay you $30,000 and $35,000. Thank you. Thank you. Because at that point in time, neither doctor, to my knowledge, and certainly Dr. Bernard Maury, never expected a dime. And that's what the jury was under the impression of. That's what I was under the impression of. That's what the doctor was under the impression of. And to suggest anything else to the jury is Kreskin in the crystal ball. Because no one, no one, he specifically said he wouldn't take a dime, even when I asked him about a charitable endeavor. That's, as both sides admit, he was not in a position to, neither of us thought he was going to come testify. That certainly was not a. . . This was the district judge's conclusion, right? Absolutely. And he wrote a very clear opinion on it. And so, you know, you wind up and you look at it, and every fact is true the way we do it. Now, you read their brief, and they assume that there was a $10,000 agreement to pay the charity beforehand. And that was in your brains when I started this. That agreement is not in the record. That's not what Dr. Maury said. That agreement did not exist like that. There wasn't even an agreement to pay a charity for him. I simply asked him, is there a charity you support? Maybe since we've taken some of your time, I could do that as well. I just want to be sure this is retracing a little bit of what we've just been talking about. I want to be sure I understand you that you can't tell us right now as you stand here as an officer of the court whether that payment to the school, $10,000, was before, during, or after trial. No, Your Honor, I cannot. I can probably go try and find the check, and I'll do a 28-J letter if the court would like. But I don't even know if—I wish it were before, but I can't conscientiously say it was before. I don't know. It could have been after. I don't know, Your Honor. If it were before, why would that be good? Well, because there's no question but that both sides thought he was never going to testify. It was not a tit-for-tat. It would not have been a payment for him to testify. He had said he would not testify. The only time he decided he would testify was when I called him and asked him, gee, they committed fraud. I'm just going to interrupt, but the logic doesn't make sense to me. Once you've got him on the stand and you're eliciting he's unpaid, he's unpaid, he's unpaid, but if that check shows you'd already paid him, there is no law in the world that would say you would allow him to go uncorrected having said I'm unpaid. He was not paid. He was not paid. No, but you—I don't—I mean, I don't mean to be sarcastic, but you're not saying if he chooses a charity, he gave you the name, you can pay them, and that's somehow not a payment to him. That's not your position, is it? Well, actually, it depends on how that goes down. If that were like he's got to raise some money for a charity, I'm going to help him out. No, of course not. But, I mean, there's not a funeral in the world where in lieu of flowers you can't give money, and that's not a payment. I mean, it's an honoring, absolutely. And I don't even know that I gave it in his name. I think I probably did it to his honor when it was finally done because I just asked that it be done. Well, I can tell you that there's a very clear rule about judicial ethics, which is that you cannot, in lieu of giving an honorary to a judge, offer to send a payment to that judge's favorite charity. That's considered a direct payment. I understand it's a different situation, but— Yeah, no, I agree, Judge. And I would love to have a good answer, but I can tell you this. Both sides, that payment was never made for him to testify. Both sides never thought he would testify until I called him and asked him, is the fraud they did on where you were president of the American Academy of Orthopedic Surgeons, is that an okay thing to do? And he said they did what? And I said they did this. And he said, I'll come tell the jury that's not right. And that's when he decided to come. And all of this is in the record? Yes, Your Honor, it is. It is. And— Your time now has expired. Yes, it is, Your Honor. The other judges have questions. Okay, Mr. Starr? Very briefly, Your Honor, the context, I think, is important, and Judge Kincaid's opinion is important. The context is Bernard Mori, renowned orthopedic surgeon, is not an expert witness. He doesn't do it. He has led his life as a renowned orthopedic surgeon. This is in the record? This is in the record. His life as a renowned orthopedic surgeon? Yes, I think that's a fair characterization of the record in light of the testimony that he was chosen by Billy Graham, among others, to perform his surgery, that he's been the president of virtually every orthopedic society, the member of the Hip Society and president of it and so forth. So the record, I think, is quite replete with the distinguished nature of his career. And when that meeting happened in LaGrange, it was a conversation, the result of which was he spent three and a half hours and made it very clear he was not going to testify. When did he get the, when was the check sent to the charity? I rely on Mr. Lanier for that, and we're going to confirm that with a 28-J. Well, if Judge Smith allows it. If Judge Smith, forgive me. It's not part of the record with the district court. It is my understanding that it's not. We also can check the record in the next trial, which I think yes. Just on your colleague's remark, I would think you'd want to hope that the check is much later, so like the 30,000 and the 35, it was an afterthought. If the check's dated before he takes the stand, it doesn't matter whether both sides didn't want him to testify, right? He then is testifying, and I read the direct of him. He is magnificent, and everything was how voluntary, how pained he had to come. It would be devastating impeachment to say, but isn't it true you met with the attorney, and in fact he's already paid your charity? I agree with your logic. I do agree with your logic, but Mr. Lanier is not sure exactly when it was done. But I will simply represent that in light of what the record will show about Bernard over his lifetime, that what he sought to do was simply, I think, respond to a sense of moral obligation of Mr. Lanier. I've taken up so much of your time. I should do something for you. And Dr. Morey went to this Catholic school in Fort Worth, and so he mentions it. But there was, and this is now I conclude with as Judge Kincaid said, there was no agreement. The evidence just is not sufficient to conclude that there's an agreement. And that, I think, should reassure the Court. The district judge, who again presented over the entire trial, heard all these experts and the like, and who has now heard Bernard Morey in Trials 3 and 4, we're talking about Trial 2, I think that what my brothers on the other side have said, I think we have a nice argument here. But it goes against, I think, the morality of the relationship, that here was this magnificent surgeon. At the record, if you read the direct testimony, including the cross-examination, I assure you, all fair-minded persons will come away with the view that Bernard Morey is beyond reproach in terms of a bought witness. That's who we were dealing with, the very, very best. And so I would leave you with Judge Kincaid's opinion. It's not Dr. Morey's opinion. What's at stake is the disclosures or the representations made by plaintiffs to the defense counsel. Yes. That we do not, he has not retained. Which was fully made at what we felt in good faith was the appropriate time, Judge Barksdale, which is when, okay, we're going to have another trial, and there was complete transparency. So the idea that there was some effort at all to hide this $10,000 contribution to a Catholic school, and then — Are you suggesting that if it was made in good faith, then it takes care of the fact that they weren't prejudiced because they didn't get to say to him, you're being paid this money? No. For that I'm relying on the there is no agreement. That's the fundamental point. These are human beings dealing with one another and coming to a moral judgment as to what is the right thing to do. But Judge Kincaid, in terms of a matter of law, said there was no agreement. And I think that should suffice to conclude this aspect of the litigation. I thank the Court. All right. Thank you, Mr. Starr. And, yes, let's go ahead and we'll receive the 28J letter. It's, to me, a little bit different thing as a fact when it's an officer of the Court telling us what went on in the proceedings of the matter. So if you'll go ahead and submit that. And, of course, the other side would have an opportunity to respond if they wish. Mr. Clement, save time for rebuttal. Yes. Thank you, Your Honor. Just a few points in rebuttal. First of all, Judge Higginson, I was with you. It does seem to me that from a timing standpoint it's worse if the check was cut before the trial because then those statements in the trial, all of that testimony about the volunteers, all the objections, it's just not accurate at that time if the check's already been cut. But I do want to follow that up with the observation it's only a little bit worse if the check comes at the time of the trial. I mean, if it comes a month later, you still have the same basic problem, which is you just — I don't think — it just doesn't seem right to me that the rule can be that you can do all of this at the trial. And even if at the time of the trial it was okay, you can't follow it up with checks after the trial that make it all an effective misrepresentation and an effective disruption of the defendants' opportunity to defend themselves. And I — The only difference is all Judge Kincaid said on the factual point is no agreement. And you would have plausible argument to say no agreement if the check, like the thank you checks, are all afterwards. But that whole notion of no agreement means nothing if the check's cut before he says I'm not paid, because it's — right? It doesn't matter if there's an agreement or not. It's a false statement made by a witness. I don't disagree with you. I'm just saying — I mean, you know, it's the difference between sort of game, set, and match in the one case versus whether you still have a problem that this Court ought to address on appeal. And I still think you do. I also want to be clear, though, even if the check doesn't come until later, it's not on all fours with the $30,000 and the $35,000 check, because you still have the exchange that takes place before, where it sure — based on the record, sure seems like there was an agreement. And if there was an agreement that the charitable contribution would be made, the fact that the check isn't cut until after the trial doesn't make that agreement go away. Now, obviously, I'm operating in a different world from my friends on the other side. I can't tell you what happened in LaGrange on a December or August day in 2015. I have to go by the record. But I think if you look at the record as developed in the second case about this meeting, it says as follows. Mr. Lanier says, I tried to pay you for the time that we took, and you would not take the money. Dr. Bernard Mori, correct. I asked you, is there a charity that you support that I could give some money to? Answer from Dr. Mori, yes. Question, and that was St. Rita's Grade School. Is that right? Yes. Now, and then he says, so I sent them a check because of the time you gave us. It was a generous check because it looked to me like they could use some money. Now, I think there's enough for an agreement right there. I don't think, I mean, unless the amount they agreed to was zero, I mean, I don't think the fact that it wasn't $10,000. Why does agreement matter at all? Why does it matter if the witness then gets on the stand and says, I got nothing, and the lawyer who sent the check knows that he did send him $10,000? Why does it matter if they agreed? I don't think it does, Your Honor, but my point is, I mean, one of two things happened. Either there was an agreement that had already been consummated with the check or there was an agreement and there was just, you know, somebody hadn't gotten around to consummating it with the check. But either way, that makes you something other than a volunteer. You're either there because you got an agreement to give money to your charity or you were there because the charity already got it. And, of course, if they disclosed that, they could then talk about how it was a wonderful charity and, in fact, Dr. Morey would be there even if they didn't do that and he could testify or they could, you know, explain how this is still worlds different from what those paid mercenaries on the other side are like. Real quickly, please, the conversation with the doctor, that son, about where do I send my invoice, oh, we'll take care of that. Was that by the son to someone on the plaintiff's side or by the son to your side about a deposition? This got very confusing during your opposing counsel's comments. That was a conversation between Dr. Matthew Morey and somebody on the plaintiff's side. Right. Thank you. And that's why it just seems to me that it is true that we paid him for his time and his deposition at a point where it wasn't clear he was going to do all the expert testimony because his principal reason for getting involved in this case is because he was one of the treating physicians in the revision surgery. So when we're taking his deposition that's focused mostly on that aspect, we're going to pay him for his time because he's a fact witness, essentially, not an adverse expert witness. By the time that he comes into trial and testifies against us as an expert on all manner of things, I don't think that he is such an innocent that he really thinks that we're going to cut him the check. And the evidence shows that that wasn't the case because he didn't ask us where to send the invoice. He asked somebody on the plaintiff's team where to send the invoice. And so I'd just leave you with the thought. I think there are multiple grounds for a new trial here and perhaps Jamal as indicated in the other trial. I think whatever else happens, though, it should be made clear. Your time has expired. I'm sorry. Thank you, Your Honor. Thank you. This case and all of today's cases are under submission, and the Court is in recess under the usual order.